UNITED STATES DISTRICT COURT
NORTHISN DISTRICT OF INDIANA
SOUTH BEND DIVISION

RODNEY E. MILLER,                    )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )        Case No.:  3:13-CV-380 JD
                                     )
CAROLYN W. COLVIN,                   )
Acting Commissioner of Social Security,  )
                                     )
        Defendant.                   )

## OPINION AND ORDER

On May 6, 2013, Plaintiff Rodney Miller filed his Complaint in this Court seeking review

of the final decision of the Defendant Commissioner of Social Security (Commissioner).  [DE 1.]

The Commissioner filed an Answer on August 22, 2013.  [DE 12.]  On October 3, 2013, Miller

filed his opening brief [DE 15], to which the Commissioner responded on January 10, 2014. [DE

23.]  Miller filed a reply on January 31, 2014.  [DE 26.]  Accordingly, the matter is now ripe for

decision.  Jurisdiction is predicated on 42 U.S.C. § 405(g).

## I.  Procedural History

Miller filed an application for disability insurance benefits (DIB) and an application for

supplemental security income (SSI)[1] in September 2006.  (Tr. 114–27.)  His applications were

denied on October 31, 2006, and again on reconsideration on February 26, 2007.  (Tr. 55–83.)

On April 17, 2009, a hearing was held before Administrative Law Judge Steven J. Neary.  (Tr.

40–54.)  On September 11, 2009, ALJ Neary issued a decision denying the claims.  (Tr. 25–39.)

The Appeals Council denied a request for review on July 9, 2010.  (Tr. 435–38.)  After the

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 401.1501 *et. seq.*, while the SSI regulations are set forth at 20 C.F.R. § 416.901 *et. seq.* Because the definition of disability and the applicable five-step process of evaluation are identical for both DIB and SSI in all respects relevant to this case, reference will only be made to the regulations applicable to DIB for clarity.

parties consented to have the magistrate determine the matter, on July 30, 2011, Magistrate Judge Christopher A. Nuechterlein reversed and remanded the case to the Commissioner for further proceedings. (Tr. 441–55.) The Appeals Counsel then vacated ALJ Neary's decision and directed the issuance of a new decision with regard to all pending applications, including Miller's duplicative subsequent claims filed on July 19, 2010 (Tr. 456-60, 479), which were denied at both the initial and appeal stages. (Tr. 439-40, 510-13, 517-23.)

On February 13, 2012, the hearing on remand was held before ALJ Edward Studzinski (the ALJ). (Tr. 637–87.) On May 22, 2012, the ALJ issued a decision denying Miller's claims. (Tr. 476–96.) Miller's petition for review of the ALJ's 2012 decision was denied by the Appeals Council on February 2, 2013, making the ALJ's decision the final decision of the Commissioner. (Tr. 505–08.)

## II. Facts

Miller was born on August 11, 1964 and he was 47 years old on the date the ALJ rendered his decision. (Tr. 115.) Miller alleges a disability onset date of January 1, 2005, and while he claims disability based on both physical and mental impairments, he does not contest the ALJ's findings relative to his physical impairments.[2] In short, the ALJ found that Miller suffered from the severe physical impairments of right rotator cuff tear with history of a partial tear and chronic obstructive pulmonary disorder (COPD). And for purposes of satisfying Listing 12.05C with respect to mental retardation, it is undisputed that Miller's severe physical impairments would satisfy Listing 12.05C's requirement that he have "a physical or other mental

---

[2] Plaintiff's memorandum does not allege any errors relating to the ALJ's decision concerning his physical impairments. [DE 15.] In response, the Commissioner states that "Plaintiff has not raised any substantive issues concerning his physical impairments; accordingly, the Commissioner's response will focus[] on the evidence regarding Plaintiff's mental impairments." [DE 23 at 2, fn. 1.] In reply, Miller did not refute this statement. [DE 26.]

impairment imposing an additional and significant work-related limitation of function."[3] Because Miller's physical limitations are otherwise not at issue, the Court focuses on the evidence relevant to Miller's mental limitations.

## A.     Evidence of Mental Impairment

Miller's high school records from LaPorte County were destroyed in accordance with its standard procedure for the destruction of old records, but the special education secretary confirmed that while Miller attended school in LaPorte County, he received services as a student considered mildly mentally handicap and was referred for special education.  (Tr. 93-294, 712-15.)  Miller's academic transcripts from New Prairie High School show that Miller participated in special education for some of his core classes and received low grades in many of his other classes.  (Tr. 297.)  Miller's differential aptitude test scores from the 9th grade indicated that he was in the 15th percentile for verbal reasoning, 25th percentile for numerical ability, 25th percentile in abstract reasoning, 15th percentile for clerical spelling and accuracy, 5th percentile for mechanical reasoning, 30th percentile for spatial relationships, 40th percentile in spelling, and 5th percentile in language usage.  (Tr. 298.)  Further documentation from Miller's school age years was not available, but he did graduate from high school. (Tr. 664.)

At the age of 42, Miller was referred to licensed psychologist John Heroldt by the state agency for a mental status consultative examination.  (Tr. 333-38.)  After missing his first appointment due to oversleeping, during his examination on February 15, 2007, Miller reported

---

[3] In *Higgins v. Barnhart*, the Seventh Circuit afforded deference to the Social Security Administration's (SSA) similar interpretation of the regulation, noting that the SSA, itself, equated "additional and significant work-related limitation" with "severe."  *Higgins v. Barnhart,* 42 Fed. App'x. 846, 849-50 (7th Cir. 2002) (unpublished opinion). *See also Peterson v. Astrue*, No. 09 C 50084, 2010 WL 5423751, at *6 (N.D. Ill. Dec. 22, 2010) ("Seventh Circuit case law clearly equates the meanings of 'additional and significant work-related limitation of function' requirement under § 12.05C and Step Two's 'severity standard'"); *Elster v. Barnhart*, No. 01 C 4085, 2003 WL 124432, at *5 (N.D. Ill. Jan. 13, 2003) ("the newly revised § 12.00 equates 'additional and significant' with 'severe.'").

getting stressed out, which caused him to get nervous, angry, and feel like killing himself—

symptoms that could last for weeks at a time.  (Tr. 333.)  It was documented that Miller had a

valid driver's license, but he had problems passing the licensing test and reported an inability to

read the newspaper.  (Tr. 333.)  It was noted that Miller typically helped his mother by cleaning

his room, taking out the garbage, and completing yard work, but his mother cleaned the rest of

the house, did the laundry, and cooked.  (Tr. 335.)  Heroldt determined that Miller's memory was

below average and he had severe difficulty with simple arithmetic calculations.  (Tr. 334-35.)

Heroldt noted that Miller's work tempo was average and his cognitive capacity was well below

average and dull.  (Tr. 335.)  Heroldt opined that Miller suffered from anxiety disorder NOS

(mixed anxiety-depressive disorder), he would not be capable of handling his own funds, and

assigned him a Global Assessment of Functioning (GAF) score of 60.[4]  (Tr. 335.)

On February 20, 2007, state agent Dr. F. Kladder completed a mental residual functional

capacity (RFC)[5] assessment and psychiatric review technique.  (Tr. 339–56.)  Dr. Kladder found

that Miller was not significantly limited in his ability to remember locations and work-like

procedures, or in his ability to understand and remember very short and simple instructions.  (Tr.

339.)  Miller was deemed moderately limited in his ability to understand, remember and carry-

out detailed instructions.  (Tr. 339.)  Dr. Kladder opined that Miller was not significantly limited

---

[4] A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* Diagnostic & Statistical Manual of Mental Disorders-Text Revision 32 (4th ed. 2000).  The higher the GAF score, the better the individual's level of functioning. While GAF scores have recently been replaced by the World Health Organization Disability Assessment Schedule, at the time relevant to Miller's appeal, GAF scores were in use. *See* Wikipedia, Global Assessment of Functioning, http://en.wikipedia.org/wiki/ Global_Assessment_of_Functioning (last visited Aug. 11, 2014).  A GAF score of 51–60 indicates moderate symptoms, such as flat affect and circumstantial speech, occasional panic attacks, or moderate difficulty in social, occupational, or school functioning.

[5] Residual functioning capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting.  20 C.F.R. § 404.1545(a)(1).

in any other area, except he was moderately limited in his ability to maintain attention and concentration for extended periods. (Tr. 339–40.) Dr. Kladder believed that Miller had actually held a job for 7 years as a laborer for a landscaping and cleaning business,[6] and noted that Miller was able to drive a car, go out alone, shop in a store for simple items, count change, and attend church regularly. (Tr. 341.) It was Dr. Kladder's impression that Miller had a history of special education, suffered from an anxiety related disorder NOS, and had mild restrictions with his activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. (Tr. 343-53.) Dr. Kladder determined that Miller could perform simple routine tasks despite his cognitive limitations. (Tr. 341.)

Miller started therapy at the Swanson Center for his depression and anxiety in September 2007. (Tr. 402, 916-35.) Clinical social worker Amy Nieman assessed Miller as suffering from anxiety and mental retardation, and assigned him a GAF score of 52. Miller's records indicate he was then seen twice in 2008 for further therapy. On January 28, 2008, Nieman stated in a narrative letter that Miller faced problems of depression, anxiety, and worrying to a debilitating point. (Tr. 402.) Further, she noted that Miller had difficulty completing tasks and learning new skills due to his symptoms. (Tr. 402.) She wrote that Miller "would like to improve his life and be more gainfully employed," but he is prevented from doing so by his anxiety and depression. (Tr. 402.) Miller's February 13, 2009 discharge summary indicated he suffered from anxiety

---

[6] While Miller indicated on his disability report that he had worked as a laborer for "landscaping, cleaning businesses" from 1985 to 2002 (Tr. 156), his earning records do not indicate employment with any single employer for seven years or more. Rather, at least from 1990 to 2011, he held over 35 jobs for very short durations—a fact which was emphasized several times by Miller's counsel at the hearing with the ALJ. (Tr. 641, 647, 648, 704-10).

disorder NOS, had a GAF score of 50,[7] and had lost his job and did not return for future therapy. (Tr. 916.)

On June 2, 2009, the state agency referred Miller for a psychological examination and WAIS-IV intelligence testing. (Tr. 418.) Licensed clinical psychologist Nancy Link noted that Miller reported constant right rotator pain and being depressed nearly every day. (Tr. 419.) Miller's "cognitions indicated discouragement, recurrent suicidal ideation, and negative outlook towards the future." (Tr. 420.) The report listed behavioral observations including characteristics of poor hygiene, appearing disheveled, seemingly immature, manipulative, impulsive, easily distracted, and restless. Link described Miller as lacking insight, having poor judgment and depressed mood, as well as a concrete and guarded thought process. (Tr. 419–20.) While Link noted that Miller had fair concentration, she also noted that he was only able to be attentive for periods of less than fifteen minutes. (Tr. 420.) Link noted Miller's sporadic work history which consisted of odd jobs that lasted only 2-3 months. *Id.*

Miller's results on the intelligence test indicated that he had a Full Scale IQ of 57, which was within the extremely-low range of functioning. (Tr. 421–22.) However, Link noted that the results were not considered a valid representation of Miller's current functioning because he did not attempt to answer somewhat difficult questions and did not put forth good effort. (Tr. 421.) Link believed that Miller's adaptive functioning was similar to others diagnosed with borderline intellectual functioning, and thought he appeared more functional than those diagnosed with mild mental retardation. (Tr. 422.) Ultimately, Link reasoned that Miller suffered from depressive disorder NOS and borderline intellectual functioning (provisional), and assigned Miller a GAF score of 60, noting he "does not have the ability to manage his own funds." (Tr. 423.) It was

---

[7] A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work).

Link's opinion that Miller should be considered "moderately impaired in terms of work related activities in respect to his overall signs and symptoms of depression and slow learning ability." (Tr. 423.)

On October 7, 2010, Miller underwent a second consultative examination by Dr. Heroldt who noted that Miller was late for his appointment with clothing disheveled, his work tempo was below average, his cognitive capacity was well below average, he had an inability to handle his own funds, and he was suffering from major depressive disorder. (Tr. 859-62.)

On October 27, 2010, Miller underwent another WAIS-IV intelligence test and an interview with clinical psychologist Joyce Scully. (Tr. 883.) Consultative examiner Joyce Scully, Psy. D., reported that the longest Miller ever held a job was a year. Overall, Miller was cooperative and the test scores appeared to be an adequate representation of his current functioning. (Tr. 884.) Specifically, Miller's verbal comprehension score was 63; his perceptual reasoning score was 75; his working memory score was 63, his processing speed score was 76, and his full scale IQ score of 64 placed him "in the extremely low end of intellectual functioning and . . . in the mildly mentally retarded range." (Tr. 882.) Miller was described as having major depression by history and "[m]ild mental retardation as evidenced by his adaptabilities which are also impaired. He has to be told when to take a shower and he has lived under the care of his mother for all of his life." (Tr. 884-85.) Scully noted the many tasks Miller regularly completed around the house and assigned Miller a GAF score of 65.[8] (Tr. 885.) Scully recommended that "[i]f claimant were to be awarded funds, I believe they would be best served to put in his brother or mother's name. His math skills were rudimentary and below average, as well as problems

---

[8] A GAF score of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

with information with long-term memory being impaired. Claimant probably would be best served working at Michiana Industries or a place such as a Sheltered Workshop." (Tr. 885.)

On November 11, 2010, state agent Dr. Ken Lovko completed a mental RFC assessment and psychiatric review technique and concluded that Miller was moderately limited in his ability to understand, remember and carry-out detailed instructions, maintain attention and concentration for extended periods, and respond appropriately to changes in his work setting. (Tr. 886–87.) After noting that Miller's longest job lasted for 7 years (again, a fact not supported by his earning records), Lovko opined that:

> [T]he evidence suggests that claimant can understand, remember, and carry-out unskilled tasks without special considerations in many work environments. The claimant can relate on at least a superficial basis on an ongoing basis with co-workers and supervisors . . . can attend to task[s] for sufficient periods of time to complete tasks . . . [and] can manage the stresses involved with unskilled work.

(Tr. 888.)

Dr. Lovko believed Miller suffered from major depressive disorder and mild mental retardation, but noted there was no testing completed before the age of 22. (Tr. 891-93.) It was Dr. Lovko's opinion that Miller had (1) mild restriction of activities of daily living; (2) mild difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no episodes of decompensation. (Tr. 900.) Further, the evidence did not establish the presence of "C" criteria. (Tr. 901.)

On January 14, 2011, state agent Dr. Kenneth Neville reviewed all of the evidence in the file and affirmed the November 2010 assessment. (Tr. 905.)

On February 21, 2012, social worker Julie Albano of the Swanson Center completed a mental RFC assessment and diagnosed Miller with dysthymic disorder with an assigned GAF score of 50. (Tr. 1039–43.) Ms. Albano believed that Miller was unable to meet competitive

standards necessary to maintain attention for two hours, work in coordination with/or proximity to others without being unduly distracted, accept instruction and respond appropriately to criticism from supervisors, and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (Tr. 1041.) He also could not meet competitive standards of neatness and cleanliness because he would forget to shower. (Tr. 1042.) The report states that the impairments have lasted or could be expected to last at least twelve months, but that he would likely not miss work because of the impairments. (Tr. 1043.) She described that Miller would "have suicidal thoughts and not want to come to work but will force himself to come to work." (Tr. 1043.) Last, Ms. Albano noted that Miller could not manage his benefits in his own interest. (Tr. 1043.)

**B.      Hearing Testimony**

At the February 13, 2012 hearing before ALJ Studzinski, Miller and Vocational Expert (VE) Micha Daoud testified. (Tr. 639-87.) Prior to the hearing testimony, Miller's counsel reiterated that Miller has had over 30 unskilled jobs in the last 15 years that lasted for only short durations. Miller's counsel argued that this high number of fleeting jobs is the result of a person who really wants to work, but is unable to on account of his mental limitations. He also contended that Miller's medical records are limited because Miller does not have insurance or the resources to get needed medical help.

*1.      Miller's Testimony*

Miller testified that all of his jobs ended after a supervisor expressed dissatisfaction with his work, often because he moved too slowly or despite doing his best they just didn't like his work. (Tr. 652-54, 658, 671–74.) Miller admitted to becoming stressed when criticized, often losing his temper, and quitting or getting fired in response to the criticism. *Id.*

Miller described a typical day as involving his watching television and helping his mom around the house, including washing dishes and cleaning his room. (Tr. 667–69.) Miller also took out the garbage, mowed the grass, and went grocery shopping. (Tr. 659–60.) He confirmed that he was unable to do arithmetic beyond simple addition and subtraction, and that he was limited in his reading ability—for instance, while he could read prices at the grocery store and street signs, he could not read novels or the TV guide. (Tr. 660-63.) He further explained that he graduated high school with assistance from special education classes. (Tr. 664–65.) Relative to his hygiene, Miller explained that he only took showers once or twice a week and he sometimes wore the same clothes for more than one day. (Tr. 664.)

Miller acknowledged that he was not receiving medical treatment because he could not afford it, although he was able to receive some therapy at the Swanson Center. (Tr. 664.) The only medication Miller took was aspirin for his shoulder pain, but it did not work very well. (Tr. 666.)

## 2. *Vocational Expert's Testimony*

VE Micha Daoud described much of Miller's past work, including janitorial work, grounds-keeping work, and porter work, as unskilled labor. (Tr. 674–75.) The ALJ then proposed two hypotheticals to VE Daoud, each describing an individual of Miller's age, education, and vocational background. (Tr. 675–82.) The first hypothetical involved an individual with the following limitations: light level work; occasional lifting of twenty (20) pounds and frequent lifting of ten (10) pounds with the left arm, and very occasional use of the dominant right arm without bearing any significant weight; no restrictions for sitting, standing or walking; no climbing of ladders, ropes or scaffolds; ability to use both hands for fine and gross manipulation without significant shoulder motion; no concentrated exposure to pulmonary irritants; no

complex reading or writing; only simple math like the addition and subtraction of one digit numbers; simple, routine, repetitive tasks, involving only simple decision making with choices among a limited number of anticipated options (rather than requiring creative solutions to novel situations); only occasional and minor changes in the work setting; and no more than brief superficial interaction with the public and his co-workers.  (Tr. 675–79.)

Based on the hypothetical, VE Daoud testified that Miller could not perform any of his previous jobs.  (Tr. 679.)  However, the VE stated that the individual could perform the light, unskilled jobs of mail sorter, DOT[9] number 209.687-026 (1,300 in the state and 71,000 in the national economy), price marker, DOT number 209.587-034 (4,700 in the state and 215,000 in the national economy), and small parts assembly worker, DOT number 739.687-030 (7,800 in the state and 309,000 in the national economy).  (Tr. 679–80.)  The VE clarified that "for all these jobs the DOT does not address the manipulative and shoulder restrictions which [the ALJ] described in this hypothetical, but I have selected jobs which I believe would be suitable based on my knowledge and experience."  (Tr. 679–80.)  She further explained that an individual would not necessarily have to be able to read as a price marker because the individual would simply be setting a price marker gun to the amount that the item is to be labeled.  (Tr. 680.)  As for mail sorter, she stated that reading names and zip codes would not require complex reading.  (Tr. 680.)  According to VE Daoud, all of the jobs she identified were considered work-alone tasks that would not require interaction with co-workers except for ordinary supervision and reporting to a supervisor.  (Tr. 680-82.)  All of the jobs would also require the employee to keep

_____

[9] When determining whether unskilled, sedentary, light, and medium jobs exist in the national economy the SSA takes administrative notice of reliable job information available from various governmental and other publications, including the *Dictionary of Occupational Titles* (DOT). *See* 20 C.F.R. § 404.1566(d); SSR 00-4p.

on task, and the failure to do so would result in contact with the supervisor and likely termination after three warnings. (Tr. 682.)

The ALJ's second hypothetical included all of the previous limitations but included even less interpersonal contact and supervision. (Tr. 681.) The VE stated that a light cleaner, DOT number 323.687-014 (6,200 in the state and 375,000 in the national economy) would fit the description, though the individual would have to be able to clean with the non-dominant arm only. (Tr. 681.)

Miller's counsel and the ALJ questioned VE Daoud about whether an individual could perform all of the aforementioned jobs if the individual was unable to compute two-digit numbers with reasonable reliability. (Tr. 682.) The VE stated that while the DOT indicated these jobs would require computation of two-digit numbers (level 1 math skills), based on her experience, knowledge, and observations of the jobs identified, there would be no need to accurately compute two-digit numbers. (Tr. 684-86.) Miller's counsel challenged VE Daoud's failure to provide actual data or reports to support his testimony relative to the mathematical requirements of the identified jobs. *Id.*

## C.  Subsequent VE Opinion

On February 23, 2012, Vocational Expert James M. Breen performed a vocational analysis at the request of Miller's counsel. (Tr. 1045.) VE Breen stated that after his review of the file, "Mr. Miller['s] past work history and current medical conditions. . . would seriously limit his ability to perform or adjust to a new occupation and all competitive occupations would be precluded." (Tr. 1046.) Breen noted that if the letter from the Swanson Center and the consultative evaluation by Dr. Scully were given consideration, then Miller would necessarily be deemed disabled as he would be unable to work forty hours a week in a competitive

environment. (Tr. 1046.) Breen also noted that Albano's mental RFC assessment from February 2012, if credited, would similarly indicate that Miller was incapable of maintaining full time competitive employment given Miller's behavioral temperaments.

VE Breen also disagreed with VE Micha Daoud's hearing testimony and opined that Miller would be unable to perform work as a mail sorter because of his difficulty with reading and inability to perform the occupation at a reasonable pace. Breen also concluded that Miller would be unable to perform work as a price marker or assembler because of his limitations with math (which were more restrictive than the DOT's lowest rating of level 1) and his inability to handle his own funds. (Tr. 1046-47.) Breen also noted that if Miller was unable to keep up with production, persistence and pace requirements or if he had to be off task for more than 10% of the day, then he would be considered unemployable. (Tr. 1047.)

**D.     The ALJ's Decision**

On May 22, 2012, ALJ Studzinski rendered his decision, ultimately finding Miller not disabled. (Tr. 476–96.) He determined that Miller suffered from the severe impairments of a right rotator cuff tear with history of a partial tear, COPD, borderline intellectual functioning, and depression. (Tr. 482.) The ALJ noted the evidence of abdominal pain and GERD, but found both to be minimal and non-severe. (Tr. 482.)

The ALJ stated that despite Miller's diagnosed impairments, "the medical evidence does not document listing level severity and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, either individually or in combination." (Tr. 482.) Relevant to Miller's mental limitations, the ALJ opined that the severity of Miller's mental impairments did not meet or medically equal the criteria for Listings 12.02, 12.04 or 12.05. (Tr. 482.)

The ALJ found that Miller had mild difficulties with performing activities of daily living and social functioning, and moderate difficulties maintaining concentration, persistence or pace. (Tr. 483.) The ALJ noted Miller's trouble performing two-digit mathematics and difficulty managing his own funds. (Tr. 483.) The ALJ found that Miller had not experienced episodes of decompensation, and commented that Miller's mental health treatment was very limited and he was never psychiatrically hospitalized. (Tr. 483.)

Relevant to this appeal, the ALJ determined that the requirements of Listing 12.05B were not met because Miller did not have a valid verbal, performance or full scale IQ score of 59 or less. (Tr. 484.) The ALJ explained that the one full scale IQ score of 57 was deemed invalid by psychologist Nancy Link because Miller did not put forth a good effort. (Tr. 484.) In addition, Listing 12.05C was not met because even though Miller had test results from October 2010 indicating a verbal IQ score of 63, a working memory score of 63, a processing speed score of 64 and a full scale IQ score of 64, these results were provided when Miller was in his 40s and not before the age of 22 as required. (Tr. 484.) And while Miller's school records revealed his participation in special education classes, the ALJ noted that he was mainstreamed for non-core classes which "suggest[ed] that his functioning was higher than mental retardation." (Tr. 484.) The ALJ then relied on Link's consultative examination which indicated Miller's functioning was similar to those diagnosed with borderline intellectual functioning as opposed to mental retardation. (Tr. 484–85.) The ALJ found it more significant that Miller was quite high functioning as evidenced by the comments made by himself, his mother (Tr. 744), and a friend (Tr. 171-82) who discussed his daily activities. (Tr. 485.) The ALJ further reasoned that Miller's GAF scores were "generally within the moderate range with one actually falling within the mild range", and he was able to sporadically work. (Tr. 485.) Ultimately, the ALJ found that

Miller "did not even overcome the first hurdle of 12.05, which is establishing an onset of his impairment before the age of 22." (Tr. 485.)

The ALJ determined that Miller had the RFC to perform less than the full range of light work, as follows:

> The claimant can lift/carry and push/pull occasionally twenty (20) pounds and frequently ten (10) pounds with his left upper extremity only; he can occasionally use his dominant right upper extremity for reaching overhead or fully extending in any direction, but he cannot bear significant weight . . . He can use his bilateral hands for fine and gross manipulation so long as the manipulated items are situated as such that he does not need to do any significant shoulder motion to get his hand in position. He can sit for a total of six (6) hours in an eight-hour workday and stand/walk for a total of about six (6) hours in an eight-hour work day. He could never climb ladders, ropes or scaffolds and should avoid all concentrated exposure to pulmonary irritants, such as fumes, odors, dusts, gasses and poor ventilation. He is limited to calculating only simple math such as adding and subtracting one digit numbers, and he cannot engage in any complex reading/writing. He is further limited to simple, repetitive, routine tasks and simple decision making, such as making a choice among a limited amount of anticipated options rather than coming up with creative solutions to novel situations. He is limited to work that requires simple judgment and he is better at dealing with the concrete rather than abstract and things rather than people. He can engage in occasional and minor changes in the work setting in terms of work processes, work place and work products. His interaction with the public can be brief and superficial, such as interactions that are incidental to his job duties. He cannot engage in a direct public service job. His interaction with co-workers must also be brief and superficial, as is common in unskilled work.

The ALJ then analyzed Miller's physical and mental impairments and explained how the RFC finding accounted for his limitations, with the ALJ's explanation relative to Miller's mental limitations being at issue here. (Tr. 489-94.) At step four, the ALJ determined that Miller was unable to perform his past work, including work as a janitor "given that he is limited to less than a full range of light work with shoulder restrictions." (Tr. 494–95.) At step five, the ALJ concluded that Miller was not disabled because in accordance with VE Daoud's testimony, Miller was able to perform unskilled, light occupations such as mail sorter, price marker, and small parts assembler. (Tr. 495.) The ALJ specifically acknowledged that per VE Daoud, the

DOT "did not address the manipulative and shoulder restrictions, and likely some of the mental limitations, noted in the residual functional capacity" but she chose the cited jobs based on her experience in the vocational rehabilitation field. (Tr. 495–96.)

### III.  Standard of Review

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review.  *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009).  Thereafter, in its review, this Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  This evidence must be "more than a scintilla but may be less than a preponderance."  *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner.  *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003).  Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision.  *Id.*  An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings.  *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).  Consequently, an ALJ's decision cannot stand if it lacks evidentiary

support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Furthermore, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. Analysis

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At step three, if the ALJ determines

that the claimant's impairment or combination of impairments meets or equals an impairment

listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R.

§ 404.1520(a)(4)(iii). However, if a listing is not met or equaled, in between steps three and

four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether

the claimant can perform his past work under step four and whether the claimant can perform

other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the

initial burden of proof in steps one through four, while the burden shifts to the Commissioner in

step five to show that there are a significant number of jobs in the national economy that the

claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Miller challenges the ALJ's decision on four grounds. First, he argues that the ALJ erred

in finding Miller did not meet or equal Listing 12.05C. [DE 15 at 9–15.] Second, Miller claims

the ALJ did not properly evaluate all of Miller's mental limitations in assessing his RFC. Third,

Miller contests the ALJ's finding that Miller was less than credible. [DE 15 at 15–19.] Last,

Miller argues that the ALJ's step five finding was erroneous because he failed to follow SSR 00-

4p with respect to VE Daoud's testimony[10] and he failed to give VE Breen's opinion any weight.

[DE 15 at 19–24.]

The Commissioner urges the Court to affirm the ALJ's decision and argues that

substantial evidence supports the determination that Miller did not have an impairment or a

combination of impairments that met or medically equaled any impairment listed in 20 C.F.R.

Pt. 404, Subpt. P, App. 1. [DE 23 pp. 3–7.] Furthermore, the Commissioner argues that

---

[10] Per SSR 00-4p, when there is an apparent unresolved conflict between VE evidence and the DOT, the
ALJ must elicit a reasonable explanation for the conflict before relying on the VE evidence to support a
determination about whether the claimant is disabled.

substantial evidence supports the ALJ's RFC finding, as well as the ALJ's step five determination. [DE 23 at 7–17.]

## A.     Listing 12.05C

Miller challenges the ALJ's finding that he did not meet the criteria of listed impairment 12.05C for mental retardation.  Specifically, Miller contends the ALJ erred when he found that Miller failed to establish intellectual disability prior to age 22, and he did not have "a valid verbal, performance, or full scale IQ of 60 through 70" as required by 12.05C.

At Step 3, the ALJ must determine whether the claimant has any of the listed impairments enumerated in the Listing of Impairments found in 20 C.F.R. pt. 404, Subpt. P, Appendix 1.  The Listing of Impairments describes impairments for each of the major body systems that the SSA considers to be severe enough to prevent an individual from doing any gainful activity.  20 C.F.R. §§ 404.1525(a), 416.925(a).  Thus, when a claimant satisfies the criteria of a listed impairment, that person is deemed disabled and is automatically entitled to benefits, regardless of his or her age, education, or work experience.  *Id.*  For each listed impairment, there are objective medical findings and other findings that must be met to satisfy the criteria of that Listing.  20 C.F.R. §§  404.1525(c)(2)–(3), 416.925(c)(2)–(3).

Listing 12.05 contains an introductory paragraph with the basic description of the impairment "intellectual disability."  Listing 12.05 also contains four sets of criteria (A through D). If the claimant satisfies the description in the introductory paragraph *and* any one of the four sets of criteria (A through D), the claimant meets the Listing and the claimant will be deemed disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Listing 12.05 states:

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; or
> B. A valid verbal, performance, or full scale IQ of 59 or less; or
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>> 1. Marked restriction of activities of daily living; or
>> 2. Marked difficulties in maintaining social functioning; or
>> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1. *See Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) ("The key term in the introductory paragraph . . . is 'deficits in adaptive functioning.' The term denotes inability to cope with the challenges of ordinary everyday life.") (citing APA, *Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSMIV-TR)* 42 (4th Ed. 2000)).

At issue here is whether the ALJ sufficiently supported his finding that Miller did not demonstrate: (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22, and (2) a valid verbal, performance, or full scale IQ of 60 through 70. In making this determination the ALJ recognized that "one of the psychological consultative examiner's [Scully], out of four, found Miller to have a verbal IQ score of 63, a working memory score of 63, a processing speed score of 64 and a full scale IQ score of 64." (Tr. 484-85.) However, the ALJ dismissed Scully's assessment that placed Miller in the extremely low end of intellectual functioning and in the mildly mentally retarded range, because the ALJ stated that the results of Scully's examination were rendered

when Miller was in his 40s and not before the age of 22. Instead of relying on Scully's test scores and diagnosis of mental retardation, the ALJ gave "great weight" to Link's psychological consultative assessment which indicated that Miller was functioning similar to those diagnosed with borderline intellectual functioning as opposed to mental retardation. The ALJ further explained that Miller's school records, though indicating his participation in special education, suggested that his functioning was higher than mental retardation because he was "mainstreamed for non-core classes." The ALJ further reasoned that Miller's activities of daily living, sporadic work as a cashier, and the majority of his GAF scores showed that he was "quite high functioning." The Court finds that the ALJ's reasoning in this respect is riddled with unexplained inconsistencies requiring a remand.

First, many circuits have recognized a presumption that IQ remains relatively constant throughout life and thus IQ tests performed after the claimant is 22 can be used to show a claimant's IQ during the manifestation period (i.e. before age 22). For instance, the Eleventh Circuit has held that "absent evidence of sudden trauma that can cause retardation, IQ tests create a rebuttable presumption of a fairly constant IQ throughout life." *Hodges v. Barnhart*, 276 F.3d 1265, 1266, 1268–69 (11th Cir. 2001). Other circuits have also recognized this presumption. *See Muncy v. Apfel,* 247 F.3d 728, 734 (8th Cir. 2001) ("Mental retardation is not normally a condition that improves as an affected person ages . . . . Rather, a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning"); *Luckey v. U.S. Dep't. of Health & Human Servs.,* 890 F.2d 666, 668 (4th Cir. 1989) (stating that there are many possible reasons why an adult would not have obtained an IQ test early in life; noting that the absence of an IQ test during the developmental years does not preclude a finding of mental retardation pre-dating age 22; and holding, "[i]n the absence of any

evidence of a change in a claimant's intelligence functioning, it must be assumed that the claimant's IQ had remained relatively constant") (relying on *Branham v. Heckler*, 775 F.2d 1271 (4th Cir. 1985)).

Likewise, the Seventh Circuit has reached a similar conclusion in *Guzman v. Bowen*, 801 F.2d 273 (7th Cir. 1986). In *Guzman,* the claimant was given an IQ test which revealed she had a low IQ that would otherwise meet the requirements of a listed mental impairment. *Guzman*, 810 F.2d at 274. However, the claimant was denied social security disability benefits because the claimant's IQ score was not assessed until after the claimant's date last insured. *Id*. The Seventh Circuit reversed the ALJ's decision and held that IQ scores remain constant overtime and that the Social Security regulations define mental retardation as a "lifelong condition." *Id*. at 275 ("we must and do assume that an IQ test taken after the insured period correctly reflects the person's IQ during the insured period."). *See also King v. Barnhart*, No. 1:06-cv-0381-DFH-TAB, 2007 WL 968746 at *3 (S.D. Ind. Feb. 26, 2007) ("A person's IQ is ordinarily presumed to remain stable over time in the absence of any evidence of a change in his or her intellectual functioning.").

In addition, the SSA has explained the meaning of the word "manifested" revealing that the SSA does not interpret Listing 12.05 to require low IQ exam findings prior to age 22.

> We did not intend . . . listing 12.05 to require intelligence testing (or other contemporary evidence) prior to age 18 . . . . The proposed listing, as in the prior rules, stated that the significantly subaverage general intellectual functioning with deficits in adaptive behavior must have been initially "manifested" during the developmental period. We have always interpreted this word to include the common clinical practice of inferring a diagnosis of mental retardation when the longitudinal history and evidence of current functioning demonstrate that the impairment existed before the end of the developmental period. Nevertheless, we also can see that the rule was ambiguous. Therefore, we expanded the phrase setting out the age limit to read: "i.e., the evidence demonstrates or supports onset of the impairment before age 22."

65 Fed. Reg. 50746 at 50772 (August 21, 2000). Thus, in this case the ALJ was not permitted to discount Miller's October 2010 IQ scores, as he did, simply because they were not rendered before Miller turned 22 years old.

Relative to the ALJ's determination that Miller had not established intellectual disability, it is certainly true that an ALJ may find that other evidence in the record is indicative of a claimant's functioning at a higher level. *See Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007); *Adkins v. Astrue*, 226 Fed. App'x. 600, 605 (7th Cir. 2007) (unpublished opinion) ("Although low IQ scores are indicative of mental retardation, other factors, such as the claimant's life activities and employment history, must be considered and weighed and properly play into the analysis."); *Hendricks v. Astrue*, No. 1:08-cv-0376-DRH-TAB, 2009 WL 648610, at *5 (S.D. Ind. Mar. 11, 2009) (remanding for further explanation of whether the claimant satisfied Listing 12.05). However, the ALJ's explanation for discounting Scully's exam results and diagnosis of mental retardation is inadequate.

In finding that Miller was higher functioning, the ALJ relied on Miller's being mainstreamed for some high school classes. But the ALJ failed to note that Miller actually received very low and even failing grades in these classes. Nor did the ALJ discuss the fact that Miller had received services as a student considered mildly mentally handicapped, and his differential aptitude test scores from the 9th grade showed results far below the norm. The ALJ also focused on Miller's ability to engage in activities of daily living and independently obtain sporadic employment as a cashier as suggestive of Miller's higher functioning. Yet, the ALJ relied on these facts without mentioning the glaring fact that Miller's hygiene was repeatedly documented as being unacceptable and his employment history *actually* consisted of over 35 unskilled jobs which didn't last long due to his inadequate performance and inability to handle

the resulting criticism. It was error for the ALJ to omit discussion of the evidence favoring Miller while relying on unfavorable aspects of the same records. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (noting that the ALJ has an obligation to consider all relevant evidence and cannot "cherry-pick" facts that support a finding of non-disability while ignoring evidence that points to a disability finding).

Additionally, in deciding that Miller was not intellectually disabled, the ALJ gave "great weight" to Link's assessment which indicated that Miller's functioning was similar to those diagnosed with borderline intellectual functioning as opposed to mental retardation. Yet the ALJ's reliance on Link's report in this respect is inconsistent with the ALJ's explicit acknowledgement that Link was unable to "get a true read on the claimant's functioning level" (Tr. 484) because Miller had failed to put forth good effort during the examination. Moreover, Link's diagnosis of borderline intellectual functioning was merely *provisional* due to the unavailability of valid IQ scores as of 2009. In a similar vein, the ALJ incorrectly remarked that Scully was the only psychological consultant who opined that Miller was mentally retarded. In reality, state agent psychological consultant Lovko documented that Miller suffered from mild mental retardation, but noted that there was no testing completed before the age of 22. Confusingly, the ALJ gave Lovko's opinion "great weight," without bothering to mention Lovko's reporting of mild mental retardation. The ALJ must correct these inconsistencies on remand.

In essence, the ALJ has not adequately explained the reasons for affording great weight to Link's opinion, while discounting Scully's exam findings—especially where Scully indicated that his test results were actually an adequate representation of Miller's current functioning. The

record does not command a determination that Miller should be awarded benefits, but the ALJ has not adequately supported his conclusions.

**B.  RFC and Credibility Determinations**

Miller asserts that in deciding his RFC the ALJ failed to make an adequate credibility finding and failed to account for some of his alleged mental limitations in the RFC. The Court agrees.

The RFC is an assessment of the work-related activities a claimant is able to perform on a regular and continued basis despite the limitations imposed by an impairment or combination of impairments. *Carradine v. Barnhart*, 360 F.3d 751, 780 n. 27 (7th Cir. 2004). This finding must be based upon all of the relevant evidence in the record, 20 C.F.R. § 404.1545(a), and this means that the ALJ is to consider, among other things, "statements about what [the claimant] can still do that have been provided by medical sources" and "descriptions and observations of [the claimant's] limitations . . . provided by [the claimant], [the claimant's] family, neighbors, friends, or other persons. *Id*. (citing 20 C.F.R. § 404.1545(e) and § 404.1529).  Further, the ALJ must consider all medically determinable impairments, even if not considered "severe," 20 C.F.R. § 404.1545(a)(2), and the RFC determination must be supported by substantial evidence. *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012).  The ALJ's decision regarding a claimant's RFC is a legal decision, rather than a medical one. 20 C.F.R. §§ 404.1546(c), 404.1527(e).

Miller is correct that in finding him not to be credible, the ALJ initially used the same boilerplate language which the Seventh Circuit has admonished ALJ's for using. *See, e.g., Bjornson v. Astrue*, 671 F.3d 640, 645–46 (7th Cir. 2012).  However, more problematic is the ALJ's failure to explain whether he found Miller incredible with respect to Miller's testimony that despite trying his best, since 1990 he has been consistently unable to work fast enough, meet

supervisor expectations, and deal with supervisor criticism in over dozens of unskilled jobs lasting less than 1 year. If the ALJ disbelieved Miller's statements concerning the reason for his erratic employment history, then the ALJ should have identified the evidence supporting his conclusion. On the other hand, if the ALJ deemed Miller credible in this respect, then he should have explained how these limitations were accounted for in the restrictions in the RFC finding. The Court is also unable to reconcile the ALJ's finding that Miller's "depression and anxiety do not appear to limit the claimant in any significant w[ay]" for purposes of providing further restrictions in the RFC, when in fact the ALJ found Miller's depression to be a severe impairment. (Tr. 482, 494.)

Moreover, the ALJ's discussion about the records supporting Miller's limitations with respect to his ability to maintain concentration, persistence and pace lacks a logical bridge. Specifically, the ALJ gave Link's opinion "great weight" in part because Link took into account Miller's "ability to be attentive, [and] cooperative." But then the ALJ, in contradictory fashion, discounted Link's opinion to the extent Link believed Miller could not be attentive for periods of less than fifteen minutes. (Tr. 490-91.) This inconsistency cannot be explained away.

Similarly problematic is the fact that, without sufficient explanation, the ALJ gave "great weight" to the state agents' opinions who opined that Miller was capable of handling the stress involved in unskilled work involving simple, routine tasks. These state agents based their opinions on the faulty premise that Miller had previously held the same job for seven years, and therefore it appeared that Miller was not as restricted as he claimed. *See Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005) (reasoning the ALJ reasonably relied upon the fact that the claimant had, during the relevant time period, been employed for four continuous months doing data entry and had lost his job not due to an inability to perform, but rather due to a decreased

workload resulting in layoffs). However, the record does not show that Miller ever held a single job for any considerable length of time, let alone seven years. Thus, the ALJ erred when he relied so heavily on the state agents' opinions without explaining how these opinions were affected by the agents' erroneous belief that Miller had at one time held the same job for seven years.

Ultimately, despite repeated references in Miller's testimony and in his medical records that he is unable to maintain pace for extended periods of time and unable to deal with criticism from supervisors, the ALJ has not explained how these limitations were accounted for in the RFC. Without such an explanation, the Court is unable to determine if the RFC finding adequately accounts for Miller's documented difficulties of dealing with ordinary supervision and maintaining concentration for a prolonged period of time. This is important because VE Daoud testified that employment as a mail sorter, price marker, and assembly worker (which could be performed with the ALJ's given RFC), still required ordinary supervision and the ability to keep on task.

The ALJ also erred by failing to sufficiently explain how Miller's ability to engage in activities of daily living means that Miller is also able to perform a full day of work on a regular and consistent basis given his mental limitations. *See Bjornson,* 671 F.3d at 647 ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons (in this case, Bjornson's husband and other family members), and is not held to a minimum standard of performance, as she would be by an employer."). In fact, Miller has a history of fleeting unskilled jobs which the ALJ never even mentioned in his opinion.

Finally, the ALJ erroneously supported his belief that Miller was not as limited by his mental health issues as suggested because Miller had extremely limited mental health treatment. However, the ALJ failed to discuss Miller's reasons for not seeking treatment for his mental health problems, despite evidence suggesting that Miller did not have the funds to obtain needed treatment. *See e.g., Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.") (citations omitted); SSR 96–7p ("the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").

On remand, rather than making the blanket assertion that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment," the ALJ is instructed to explain which statements of Miller's were discredited and the basis for discrediting the alleged limiting effects of his symptoms. In addition, the ALJ shall explain how Miller's actual abilities and limitations were accounted for in the RFC assessment.

## C.    Step-Five Finding

The ALJ found that Miller could not perform his past work (step four), but he was able to perform other jobs that existed in significant numbers in the national economy (step five). In deciding what work Miller was capable of performing, the ALJ relied on VE Daoud's testimony, which in turn relied on the ALJ's hypothetical (containing the same limitations as found in the

insufficiently supported RFC).  The ALJ also rejected VE Breen's report, which was based on a more restrictive RFC than ultimately determined by the ALJ.

While Miller contests the ALJ's crediting the testimony of VE Daoud and discounting the report of VE Breen in making these findings, the Court need not analyze this issue where a remand is necessary on other grounds which made both Daoud and Breen's opinions suspect.  In other words, because VE Daoud's testimony was based on the specific limitations posed in the ALJ's hypothetical which mirrored the unsubstantiated RFC determination, her testimony is unreliable at this point.  And whether or not it was error for the ALJ to afford no weight to VE Breen's opinion will also depend on the outcome of the remand.  While it is true that VE Breen opined that certain restrictions would preclude all work, his testimony was contingent upon the belief that certain of Miller's limitations were as severe as documented in the record.  However, it is the ALJ's duty to assess the weight to be afforded to the record evidence and to determine the claimant's actual limitations and resulting RFC.[11] *See* 20 C.F.R. §§ 404.1520(e), 404.1545, 404.1546(c).  As a result, steps four and five cannot be properly analyzed in this appeal. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (the ALJ must determine the claimant's RFC before performing steps 4 and 5 because a flawed RFC typically skews questions posed to the VE); 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8p.

Once the ALJ provides adequate support for his credibility and RFC findings, then the Court can assess whether a VE's testimony can be relied upon as an accurate indicator for the type of work Miller is capable of performing.  The record does not require an award of benefits at this point.  However, the Court would note for purposes of remand (and to address an argument posed by Miller's counsel) that the DOT lists only the maximum requirements of

---

[11] Ultimately, if the ALJ determines that Miller cannot handle ordinary supervision and/or cannot sufficiently remain on task, then Miller would not be able to perform the jobs identified by VE Daoud or other jobs in the economy.

occupations as generally performed, and a VE is allowed to provide more specific information about job requirements based on a VE's experience in job placement or career counseling. *See* SSR 00-4p.

## V. Conclusion

For the aforementioned reasons, the Commissioner's decision is REMANDED for further proceedings consistent with the conclusions in this order.

SO ORDERED.

ENTERED:   August 19, 2014

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court